# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DOHERTY & LESLIE WESTMORELAND, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMENITY CAPITAL BANK & COMENITY BANK,<br><br>Defendant. | Case No.: Case No.: 16cv1321-H-BGS<br><br>**ORDER RESOLVING DISCOVERY DISPUTES ADRESSED IN THE PARTIES' JOINT STATEMENT** |

On April 17, 2017, Plaintiffs Michael Doherty and Leslie Westmoreland ("Plaintiffs") and Defendants Comenity Capital Bank and Comenity Bank ("Defendants") submitted a Joint Statement About Discovery Dispute Re: Responses of Defendant Comenity Capital Bank to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production ("Joint Statement"). (ECF No. 30.) As first identified during a telephonic Discovery Conference held on April 5, 2017 with Chambers and thereafter in their Joint Statement, the Parties dispute the following categories of requested information regarding call recipients: (1) outbound dial lists; (2) documents related to defendants' affirmative defense of "prior express consent;" (3) telephone dialing equipment used, including skip

1

trace reports and numbers obtained via number trapping; and (4) employee and dialer manuals used.[1] (ECF No. 27.) After considering the arguments of the Parties set forth in the Joint Motion, and its supporting exhibits and declarations, and the applicable law, and for the reasons set forth herein, the Court **GRANTS IN PART** Plaintiffs' requests to compel Defendants to produce further responses to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production as outlined below. All discovery requests not **GRANTED IN PART** below are hereby **DENIED**.

## I. BACKGROUND

This is a class action alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA"). Defendants are large national banks that "service millions of credit card accounts for consumers throughout the United States." (ECF Nos. 10-11 ¶ 15.) Plaintiffs proceed on their First Amended Complaint (ECF No. 10) and seek to certify the following class from July 31, 2014 to present ("relevant time period"):

> All individuals in the United States to whom: (1) Defendants placed a call; (2) using an automatic telephone dialing system ["ATDS"] or using an artificial or prerecorded voice; (3) to his or her cellular telephone number; and (4) for whom Defendants did not have express consent to place such call at the time it was placed.

(ECF No. 10 ¶ 33; ECF No. 30 at 1:4-6.) Plaintiffs allege that without prior express consent, Defendants called them on their "cellular phones via an 'automatic telephone dialing system,' ('ATDS') as defined by 47 U.S.C. § 227 (a)(1) and by using 'an artificial or prerecorded voice' as prohibited by 47 U.S.C. § 227 (b)(1)(A). This ATDS has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." (ECF No. 10 ¶¶ 27, 32.) Specifically, Plaintiff Doherty alleges that

---

[1] As requested by the Court, the Parties attached all contested interrogatories and requests for production to their Joint Statement. (ECF No. 30, Ex. 1.) However, in keeping with the manner in which the Parties addressed the overarching categories of contested discovery in their Joint Motion, this Order does not address each individual discovery request. Instead, it analyzes each of the identified overarching categories. The Parties are to apply this analysis to individual requests and effect discovery in keeping with this Order.

on November 29, 2015 and on December 4, 2015, Defendant Comenity Capital Bank called his cellular telephone ending in 7814 with a prerecorded or artificial voice and left automated voicemails regarding his father's account. (*Id.* ¶¶ 24-25.) Plaintiff Westmoreland claims "Comenity Bank called his cellular telephone ending [in] 6053 incessantly throughout 2016."[2] (*Id.* ¶ 26.) Neither of the Plaintiffs are themselves account holders of credit cards that Defendants service; rather they are relatives of such cardholders. (*Id.* ¶¶ 21-23; ECF No. 30 at 8-9.)

During the class discovery period (*see* ECF No. 23 ¶ 2), Plaintiffs served Requests for Production and Interrogatories on Defendants. Defendants limited their responses to information and documents pertaining to the named Plaintiffs: they objected to requests regarding all call recipients as premature, irrelevant, overbroad, unduly burdensome, and not proportional to the needs of the case[3] given the fact that Plaintiffs are unlikely to succeed on the merits of their action or on a motion for class certification. (*See* ECF No. 30, Ex 1.) The following four discovery categories remain in dispute: (1) outbound dial lists; (2) documents related to defendants' affirmative defense of "prior express consent;" (3) telephone dialing equipment used, including skip trace reports and numbers obtained via number trapping; and (4) employee and dialer manuals used. (ECF No. 27.)

As noted in the Court's Order requesting the Joint Statement (*id.*), despite their awareness of a disagreement over these categories of documents for months (ECF Nos. 19, 21, 22), the Parties did not raise this dispute with the Court until March 31, 2017. Class

---

[2] Plaintiffs previously maintained that Defendants' calls to a second cell phone number (ending in 6052) associated with Plaintiff Westmoreland violated the TCPA; however, as Defendants provided documents evidencing consent during discovery, Plaintiffs have withdrawn those claims. (ECF No. 30 at 5:12-16.) Thus, only calls to Plaintiff Westmoreland's cell phone number ending in 6053 are at issue.

[3] In their discovery responses, Defendants asserted boilerplate objections to Plaintiffs' requests for production and interrogatories, including that such requests were premature, were vague and ambiguous, sought confidential/proprietary information, were overbroad and unduly burdensome, infringed on the privacy rights of third parties, sought irrelevant information, and were not proportional to the needs of the case. (*See* ECF No. 30, Ex. 1 at 2-19.) The Court only addresses the objections and arguments Defendants raise in the Joint Motion.

discovery closed on April 7, 2017 and the June 9, 2017 deadline for filing a motion for class certification is readily approaching. (ECF No. 23.)

## II. DISCUSSION

Rule 26, as recently amended, provides that a party

> may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Information need not be admissible in evidence to be discoverable. *Id.* The December 2015 amendment to Rule 26 restored the proportionality factors in defining the scope of discovery. *See* Advisory Committee Notes to Rule 26(b)(1) 2015 Amendment. Under the amended Rule 26, relevancy alone is no longer sufficient to obtain discovery: the discovery requested must also be proportional to the needs of the case. *Mora v. Zeta Interactive Corp.*, No. 116cv00198-DAD-SAB, 2017 WL 1187710, at *3 (E.D. Cal. Feb. 10, 2017).

The relevance standard is commonly recognized as one that is necessarily broad in scope in order "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). Discovery is designed to help define and clarify the issues. *Id.* Evidence is relevant if: (a) "it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Although relevancy is broadly defined for the purposes of discovery, it does have "ultimate and necessary boundaries." *Hickman*, 329 U.S. at 507. Accordingly, district courts have broad discretion to determine relevancy for discovery purposes. *See Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002); *Vinole v. Countrywide Home Loans, Inc.*, 571

F.3d 935, 942 (9th Cir. 2009) ("District courts have broad discretion to control the class certification process, and '[w]hether or not discovery will be permitted . . . lies within the sound discretion of the trial court.'") (citing *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 209 (9th Cir. 1975)).

Precertification discovery lies entirely within the court's discretion. *See* Fed. R. Civ. P. 23; *see, e.g.*, *Artis v. Deere & Co.*, 276 F.R.D. 348, 351 (N.D. Cal. 2011) (citing *Vinole*, 571 F.3d at 942). The Ninth Circuit states that the "advisable practice" for district courts on precertification discovery, "is to afford the litigants an opportunity to present evidence as to whether a class action was maintainable. And, the necessary antecedent to the presentation of evidence is, in most cases, enough discovery to obtain the material, especially when the information is within the sole possession of the defendant." *Doninger v. Pac. Northwest Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977); *see also Artis*, 276 F.R.D. at 351. The court should consider "the need for discovery, the time required, and the probability of discovery providing necessary factual information" in exercising its discretion to allow or prohibit discovery. *Doninger*, 564 F.2d at 1313.

Many of the arguments advanced by Defendants go to the ultimate merits of Plaintiffs' motion for class certification or other potentially dispositive motions. It is Judge Huff who must decide whether the requirements of Rule 23 have been satisfactorily established. For purposes of discovery, a plaintiff must only make a prima facie showing that the class action requirements[4] are satisfied or show "that discovery is likely to produce substantiation of the class allegations." *Manolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir.

---

[4] On a class certification motion, the District Court must determine that the requirements of Rule 23 have been met. Per Rule 23(a), Plaintiffs must satisfy the prerequisites of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. Per Rule 23(b), Plaintiffs must establish one of the following three requirements: (1) risk of inconsistent adjudication, or that the adjudication of individual class member's claims would substantially impair non-party members' ability to protect their interests; (2) defendant acted on grounds generally applicable to the class such that relief is appropriate to the class as a whole; or (3) common questions of law or fact predominate and class resolution is superior to other available methods. Fed. R. Civ. P. 23.

1985). Thus, courts permit precertification discovery on issues like typicality, commonality, and numerosity if it would substantiate the class allegations. *Kilbourne v. Coca-Cola Co.*, No. 14CV984 MMA (BGS), 2015 WL 10943611, at *5 (S.D. Cal. Jan. 13, 2015). In the context of this discovery dispute, the Court will assess whether Plaintiffs have demonstrated that the information sought is relevant to their preparation for their motion for class certification. *See Manolete*, 767 F.2d at 1424.

### A. Category One: Outbound Dial Lists

Plaintiffs first address discovery requests concerning Defendants' outbound dial lists, (Interrogatories Nos. 7, 8, and 9; Requests for Production Nos. 10, 41, 43, and 44). They assert that defendants in other TCPA cases regularly produce such outbound dial lists. *See, e.g.*, *Webb v. Healthcare Revenue Recovery Grp. LLC*, No. C. 13-00737 RS, 2014 WL 325132, at *2-3 (N.D. Cal. Jan. 29, 2014); *Knutson v. Schwan's Home Serv., Inc.*, No. 12CV964-GPC DHB, 2013 WL 11070939, at *2 (S.D. Cal. July 23, 2013); *Gusman v. Comcast Corp.*, 298 F.R.D. 592 (S.D. Cal. 2014); *accord Ossola v. American Express Company*, 2015 WL 5158712, at *7 (N.D. Ill. E.D. 2015) ("Call data is relevant, and thus produced as standard practice, only in cases where the defendant is the alleged dialer."). Defendants object, arguing that Plaintiffs as noncardholders are atypical, will fail on the merits of their class certification motion, and are susceptible to dispositive motions that have not yet been filed. (ECF No. 30 at 7-12.)

Defendants essentially seek to litigate Rule 23 class certification prematurely. While these arguments may eventually prove convincing, *see e.g.*, *Labou v. Cellco P'ship*, No. 2:13-CV-00844-MCE, 2014 WL 824225, at *4, *6 (E.D. Cal. Mar. 3, 2014) and *Davis v. AT&T Corp.*, No. 15CV2342-DMS (DHB), 2017 WL 1155350, at *4-6 (S.D. Cal. Mar. 28, 2017), they are premature given that discovery is still ongoing and no motion for class certification has yet been filed. Defendants have conflated these issues – "even if Plaintiff[s'] claims may be ultimately found atypical when the Court rules on [a] motion for class certification, that does not impact Plaintiff[s'] right to discover relevant information now during the pre-certification discovery period." *Haghayeghi v. Guess?,*

*Inc.*, 168 F. Supp. 3d 1277, 1279-80 (S.D. Cal. 2016) (on a motion to compel, rejecting defendant's reliance on TCPA cases denying class certification where phone number at issue was provided by someone other than plaintiff, such as by a family member). The Court will not attempt to predict whether Plaintiffs' claims will ultimately be found atypical. Instead, the Court turns to the proposed class definition, which does not distinguish between call recipients who are cardholders and noncardholders, to assess the relevancy of Plaintiffs' requests.

The Court finds that outbound dial lists are relevant to establish the issues of numerosity and commonality under Federal Rule of Civil Procedure 23(a) and are therefore discoverable. *See Knutson v. Schwan's Home Serv., Inc.*, No. 12CV964-GPC DHB, 2013 WL 11070939, at *1-2 (S.D. Cal. July 23, 2013) (emphasis in original) ("The common question is thus, 'were we all called *on our cellular telephones*, by an autodialer or artificial or prerecorded voice, on behalf of [Defendants], without having given express consent'"); *Haghayeghi*, 168 F. Supp. 3d at 1280-81; *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, No. 13CV1556-JLS DHB, 2014 WL 3894348, at *2 (S.D. Cal. June 12, 2014); *Stemple v. QC Holdings, Inc.*, No. 12-CV-1997-CAB WVG, 2013 WL 10870906, at *2 (S.D. Cal. June 17, 2013) (outbound dial lists "will provide Plaintiff a means to ascertain which of the numbers dialed within the statutory term are cellular telephone numbers called by an autodialer"); *Gossett v. CMRE Fin. Servs.*, 142 F. Supp. 3d 1083, 1086-87 (S.D. Cal. 2015); *Henderson v. United Student Aid Funds, Inc.*, No. 13CV1845-JLS BLM, 2015 WL 4742346, at *7 (S.D. Cal. July 28, 2015); *Thrasher v. CMRE Fin. Servs., Inc.*, No. 14-CV-1540 BEN NLS, 2015 WL 1138469, at *1-3 (S.D. Cal. Mar. 13, 2015); *O'Shea v. Am. Solar Sol., Inc.*, No. 14CV894-L (RBB), 2016 WL 701215, at *3 (S.D. Cal. Feb. 18, 2016).

Although the Parties dispute whether outbound dial lists can be generated using a "report generation wizard" via the Avaya Proactive Contact 5.1 system (*compare* Lahr Declaration ["Decl."] ¶¶ 9-10 *with* Hansen Decl. ¶¶ 7-10), Defendants admit that such a list can be produced in approximately five hours utilizing the system (Lahr Decl. ¶ 12). Such a list would not distinguish landlines from cell phones. (ECF No. 30 at 12:26-27.)

However, Plaintiffs' expert consultant is able to identify which calls were made to cellphones from the outbound dial list, a common issue as to the class, as well as the number of calls made to each cellphone. (*Id.* at 6:25-27; Hansen Decl. ¶¶ 11-12.) A list of phone numbers dialed by a dialer by Defendants therefore is relevant, especially in light of the fact that Plaintiffs claim cell phone numbers can be identified within the list. Thus, the production of an outbound dial list utilizing the Avaya Proactive Contact 5.1 system is both relevant and proportional to the needs of the case.

However, Defendants maintain that they are unable to "systematically identify all phone numbers called" during the relevant time period, as calls "manually dialed" via the Avaya 9611G desk phone would "not be included in an output of the Avaya Proactive Contact system." (ECF No. 30 at 12:26-27; Lahr Decl. ¶ 15.) Thus, the Parties contest whether an outbound dial list must be produced for "manually dialed" numbers, which Defendants claim is the method by which all skip traced numbers are first dialed and how Plaintiff Westmoreland's 6053 cell phone was contacted. (ECF No. 30 at 9:20-23; ECF No. 30, Ex 1 at 10:4-20, 11:3-10; Duchesne Decl. ¶ 5.)

Whether calls were made using an ATDS is typically a contested issue in a TCPA case. *See Mora*, 2017 WL 1187710, at *6. The Parties' submissions underscore this fact, as Plaintiffs readily contest whether what Defendants refer to as a "manual" call, falls within the statutory ATDS definition.[5] (*Compare* ECF No. 30 at 4:17-24, *and* Hansen

---

[5] The Court has not reviewed manuals or technical specifications associated with the identified dialing equipment used by Defendants to contact Plaintiffs, the Avaya Proactive Contact 5.1 system and the Avaya 9611 G desk phone connected to the Avaya Aura 6.3 phone system. (See ECF No. 30, Ex 1 at 10:4-20, 11:3-10.) However, Defendants assert that their policy is to "manually dial" all numbers obtained by skip tracing. (Duchense Decl. ¶ 5; ECF No. 30 at 9:20-23.) They claim this "manual dialing" procedure applied to Plaintiff Westmoreland's 6053 cell phone, as the output generated by the Avaya Proactive Contact 5.1 system did not include calls to the 6053 number. (ECF No. 30, Ex. 1 at 10:8-20, 11:3-10; Duchense Decl. ¶ 5.) Defendants maintain that number was "manually" dialed as it was called using an Avaya 9611G desk phone connected to the Avaya Aura 6.3 system. (ECF No. 30, Ex. 1 at 10:8-20.) Plaintiffs' expert consultant readily contests this assertion. (Hansen Decl. ¶¶ 13-16.) Without further briefing at this stage, it is unclear whether calls that Defendants state were "manually" dialed using an Avaya 9611G desk phone would have been placed via an ATDS, defined as equipment "which has the **capacity**—(A) to store or produce telephone numbers to be called, using a random or sequential number

Decl. ¶¶ 13-16, *with* Lahr Decl. ¶¶15, 17-18 *and* Duchesne Decl. ¶ 5, 7.)  This is a merits issue; and as such, the Court is not inclined to limit the requested outbound dial lists based on Defendants' use of the term "manual."[6] *See Mora*, 2017 WL 1187710, at *6 (defendants not allowed to only produce outbound dial lists for calls that they believe meet the definition of using an ATDS).

However, Defendants claim there is no way to "systematically identify" manually dialed calls made using Avaya 9611G desk phones during the relevant time period (Lahr Decl. ¶ 15).  Without making a premature determination as to Defendants' "manual" dialing, the production of an outbound dial list for "manually dialed" calls utilizing Avaya 9611G desk phones (and not for calls made via the Avaya Proactive Contact system) would be disproportionate to the needs of the case given that discovery at this point is focused on class certification and not merits. *See Gusman*, 298 F.R.D. at 597 (holding facts on the record did not justify imposing a significant burden on defendant to produce an outbound dial list of marketing calls when the case involved collection calls).

Given their relevance to Plaintiffs' claims and the proportionality to the needs of the case, the Court finds that Plaintiffs' request for Defendants' outbound dial list should be **GRANTED IN PART**.  Defendants shall provide Plaintiffs with an outbound dial list for calls made during the relevant time period to the extent they are able to do so.  This list is to be comprised of all outbound calls made both to landlines and cell phones that can be generated using the Avaya Proactive Contact 5.1 system.  This includes any calls

---

generator; and (B) to dial such numbers" as required by the TCPA, given that capacity "includes potential functionalities."  47 U.S.C. § 227(a)(1) (emphasis added); *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C. Rcd. 7961, 7974 (July 10, 2015).
[6]The Court finds Defendants' reliance on *Gossett*, 142 F. Supp. 3d at 1089-90 inapposite.  There, Defendants submitted sworn statements that numbers obtained by skip tracing and number trapping were "only *physically dialed by humans*." *Id.* at 1190 (emphasis added).  Defendants' declarations merely refer to a "manual dialing" procedure; they make no sworn statements in which they refer to humans physically picking up a phone and dialing a number as occurred in *Gossett*.  In their discovery responses they state such calls "require human intervention" (ECF No. 30, Ex. 1 at 11:9-10), which does not foreclose the possibility that such a system could fall into the TCPA's definition of an "ATDS."  (*See* Hansen Decl. ¶¶ 13-16.)

9

Case No.: 16cv1321-H-BGS

Defendants deem to have been "manually dialed" if they were made using the Avaya Proactive Contact 5.1 system, but excludes any calls that were placed solely utilizing Avaya 9611G desk phones. Plaintiffs' expert consultant will then be able to use such outbound dial lists to identify which calls were placed to cell phones.

### B. Category Two: Prior Express Consent of Call Recipients

Next, Plaintiffs address discovery regarding information that Defendants plan to rely on to show the prior express consent of call recipients (Interrogatory No. 10) and requesting that Defendants produce any documents to support that contention (Requests for Production Nos. 15-16), as well as documents related to the processes used to verify such consent (Request for Production No. 18). Plaintiffs contend that the "consent issues" at play, which they break down into three categories, can all "be answered on a class-wide or sub-class wide basis." (ECF No. 30 at 14:9-12.) Accordingly, they request a breakdown as to the number of call recipients that Defendants contend fall within each prior express consent category. (*Id.* at 15:1-2.)

Defendants object to the relevancy of these requests based on (1) the unviable nature of Plaintiffs' individual claims and (2) the various ways that Defendants obtain accountholder consent render a class uncertifiable. (*Id.* at 16:17-24.) Further, they claim that due to the manner in which Plaintiff Doherty's phone number was obtained (via online Account Center), the evidence of prior express consent requested by Plaintiffs "would not even uncover other class members similar to Plaintiffs." (*Id.* at 16:25-17:4.)

Defendants contend that to determine how consent was obtained for a phone number in their system, an account-by-account review of each cardholder would have to be undertaken. They estimate that approximately 18.9 million unique accounts would need to be reviewed for the time period at issue, and assuming an average of 7.5 minutes for review of each account and its corresponding documentation (collection notes, customer

10

Case No.: 16cv1321-H-BGS

service notes, call recordings, phone history, and credit application), such a review would cost $18.9 million.[7]  (Duchesne Decl. ¶¶ 16-17; Lahr Decl. ¶¶ 5-7.)

As prior express consent is an affirmative defense in which Defendants will bear the burden of proof in this TCPA action, *Gaines v. Law Offices of Patenaude & Felix, A.P.C*, No. 13cv1556-JLSDHB, 2014 WL 3894348, at *4 (S.D. Cal. Aug. 7, 2014), the Court finds that such information and documents are relevant to the defenses at issue, as well as Rule 23(b)(3) predominance at class certification.  *See, e.g.*, *Davis*, 2017 WL 1155350, at *5-6. Thus, Plaintiffs are entitled to develop classwide evidence/a common method of proof that could address the issue of prior express consent.

However, Defendants obtain consent in a variety of ways, including via an online Account Center, over the phone, via Interactive Voice Response, and per credit card applications.  At this stage of litigation, an account-by-account review, as Defendants assert would be necessary, to ascertain the method by which consent was obtained for each individual call recipient is disproportionate to the needs of the case and would prove unduly burdensome given Defendants' time/cost estimates. *See Gaines*, 2014 WL 3894348, at *5 (finding interrogatory requesting the means by which defendant obtained prior express consent to call any call recipient overbroad and unduly burdensome); (Lahr Decl. ¶¶5-8.) Providing a breakdown as to the number of call recipients that fall within each category is similarly unduly burdensome and disproportionate to the needs of the case at this juncture. This is only underscored by the fact that individualized evidence of prior express consent as to account holders may not even pertain to other class members similar to Plaintiffs (i.e., noncardholders).  At this stage of litigation, Defendants need only provide evidence of prior consent if they intend to rely on it at class certification. *See Gossett*, 142 F. Supp. 3d at 1089; *Thrasher*, 2015 WL 1138469, at *6.

---

[7] Defendants maintain the same account-by-account review would be necessary to ascertain which numbers were obtained via skip tracing and number trapping. *See* Section II.C.

11

Thus, to the extent Defendants intend to address the affirmative defense of prior express consent at class certification stage, the Court hereby **GRANTS IN PART** Plaintiffs' motion to compel further responses as to documents evidencing call recipients prior express consent. To the extent they have not already done so, Defendants are to provide representative samples (blank copies) of all standardized forms/documents (e.g., credit card applications), scripts for obtaining consent via phone calls or Interactive Voice Response, screen shots of how individuals are able to provide/update phone numbers via the Account Center, documents showing the manner in which prior express consent could be obtained for noncardholders, or any other methods upon which they may rely to show putative class members' prior express consent during the relevant time period.

Defendants are not required to conduct an account-by-account review to produce documents as related to individual call recipients. If a class is certified, Plaintiffs may reassert their request for prior express consent documents as they pertain to individual call recipients during merits discovery.

**C. Category Three: Telephone Dialing Equipment Used and Skip Tracing/Number Trapping**

Plaintiffs next address discovery requests for information regarding (1) manuals relating to all dialers used during the proposed class period (Interrogatories Nos. 11 and 13; Requests for Production Nos. 7, 22, 40, 44, 48) and (2) phone numbers obtained classwide by skip tracing or number trapping (Interrogatories Nos. 3-5 and Requests for Production Nos. 23, 28, 31, 36, 37, and 45-47). In the Parties' Joint Statement, Defendants agree to produce responsive documents as to the dialer manuals. (EFC No. 38 at 18:20-21.) As such, the Court **GRANTS** Plaintiffs request to compel Defendants' production of such dialer equipment manuals.

Turning to the skip tracing[8] and number trapping[9] requests, Plaintiffs maintain that phone numbers obtained utilizing these methods are "not subject to the prior express consent defense," avoiding a potential predominance issue at class certification, and could potentially constitute their own subclasses. (ECF No. 30 at 18: 8-9.) Thus, information regarding such numbers and the methods by which such numbers are dialed is relevant to the claims and defenses at issue and go to the issues of Rule 23 commonality and predominance.

However, Defendants object to producing information about call recipient phone numbers that were obtained via skip tracing or number trapping. First, they argue such information is irrelevant, as (1) neither of the Plaintiffs' phone numbers were obtained via number trapping and (2) Plaintiff Westmoreland's 6053 phone number obtained via skip tracing was not autodialed. (*Id.* at 18:25-19:2.) Further, they claim their policy is to "manually dial" number trapped and skip traced numbers.[10] (Duchesne Decl. ¶¶ 5, 7.) If such numbers were truly dialed by a human on a device that does not have the capacity to autodial (so as to fall outside the definition of an ATDS per 47 U.S.C. § 227(a)(1)), then Plaintiffs arguably would not be entitled to the requested discovery. *See Gossett*, 142 F. Supp. 3d at 1089-90; *supra* n.6.

Defendants maintain that a list of numbers "found via *manual* skip trace does not exist" and that to compile such a list would require an account-by-account review taking

---

[8] Per the definitions governing Plaintiffs' discovery, skip tracing "means or refers to the practice of locating a PERSON'S contact information, including his or her phone number, through searching phone number databases, credit reports (e.g., information provided on a loan application, credit card application, and/or in other debt collector databases), job application information, criminal background checks, utility bills, social security records, disability records, public tax information, and other public and private contextual data sources to use available information (such as past or present name or address) to determine more current contact information." (ECF No. 30-5 ¶ 23.)

[9] Per the definitions governing Plaintiffs' discovery, number trapping "means or refers to the practice of utilizing caller identification technology to IDENTIFY and/or collect a PERSON'S phone number when that PERSON places a call to YOU." (*Id.* ¶ 15.)

[10] Additionally, Defendants argue that as Plaintiffs are not themselves cardholders, they lack standing to "assert a class of both cardholders and noncardholders." (*Id.* at 19:3-10.) As discussed *supra*, the Court is not delving into merits issues for the purposes of this motion and at this stage of the litigation.

an estimated 2,362,500 hours and costing an estimated $18.9 million. (Lahr Decl. ¶¶ 17-20 [emphasis added].) However, they also state that "[f]or Comenity to identify skip traced numbers called *by any method* [during the relevant time period it] would require approximately 40-80 hours" (*Id.* ¶ 16 [emphasis added]). These statements taken together indicate that there is a group of skip traced phone numbers that were called utilizing methods **other** than "manual dialing," which would presumably include calls made via the Avaya Proactive Contact 5.1 system and other such dialing systems. This appears inconsistent with Defendants' statements that its "policy and procedure is not to autodial a skip-traced number." (ECF No. 30 at 9:22-23; *Id.* at 20:12-14; Duchense Decl. ¶ 5.)

Due to this apparent ambiguity, the Court **GRANTS IN PART** Plaintiffs' request for documents and information related to the general policies and processes by which Defendants dial numbers obtained via skip tracing and number trapping for the duration of the relevant time period. To the extent that Defendants are able to identify skip traced numbers that were called "by any method" other than those that were "found via manual skip trace" they are to do so.

Further, pursuant to the Court's order regarding outbound dial lists in Section II.A, Plaintiffs will be in receipt of numbers obtained via skip tracing and number trapping if such numbers were dialed with the Avaya Proactive Contact 5.1 system. To the extent possible **without** conducting an account-by-account review as set forth in the Lahr Declaration (Lahr Decl. ¶¶ 17-22), Defendants shall identify any numbers on this outbound dial list which were obtained via skip tracing or number trapping. Again, an account-by-account review is not proportional to the needs of the case at this time. *See Gaines*, 2014 WL 3894348, at *6.

As discussed *supra*, Plaintiffs readily contest that Defendants "manually dialed" phone numbers in such a way as to prevent a TCPA violation. *See supra* n.5. This is largely a merits issue that is not directly before the Court on this motion. However, the Parties' dispute as to Defendants' "manual dialing" procedures is a foundational issue in this case, as TCPA claims are conditioned upon the use of an ATDS. *See Meyer v. Portfolio*

1  *Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (emphasis added) ("The three
2  elements of a TCPA claim are: (1) the defendant called a cellular telephone number;
3  (2) **using an automatic telephone dialing system**; (3) without the recipient's prior express
4  consent."); 47 U.S.C. § 227(b)(1). Without further information regarding what is meant
5  by the term "manually dial," it is unclear if Plaintiffs' request for numbers obtained via
6  skip tracing and number trapping as applied to numbers "manually dialed" bears any
7  relevance to their claims or class certification. *See Gossett*, 142 F. Supp. 3d at 1089-90;
8  *supra* n.6.

The Court will allow limited discovery to address what Defendants refer to as their "manual dialing" procedures and policies, specifically in relation to skip traced and number trapped phone numbers. As part of this limited discovery, Plaintiffs may notice a Rule 30(b)(6) deposition to assess the procedures surrounding "manually dialed" calls during the relevant class period. *See Gusman*, 298 F.R.D. at 596 ("Rule 30(b)(6) deposition can be utilized to obtain the relevant data to determine an approximate number of calls made to cell phones using an autodialer during the proposed class period"). Such limited discovery is to be completed by **June 8, 2017**. If the "manual dialing" issue has not been resolved following this limited discovery, the Parties can contact the Court, and the Court will treat it as a new discovery dispute pursuant to Chambers rules.

### D. Category Four: Manuals Used

Finally, Plaintiffs address discovery requests for employee and dialer manuals used to procure and dial the numbers of call recipients (Requests for Production Nos. 39 and 40). They argue the manner in which employees obtained phone numbers to call (directly, skip tracing, number trapping, etc.) would inform whether prior express consent was given. (ECF No. 30 at 19:24-20:7.) Defendants object to the relevancy of these requests, again asserting that because they did not autodial Plaintiff Westmoreland's skip traced 6053 number and neither of Plaintiffs' phone numbers were obtained via number trapping, such policies and procedures are irrelevant. (ECF No. 30 at 20:9-25.)

15

The Court finds the information sought by Plaintiffs not only relevant to the issue of prior express consent, but also to the Rule 23 issues of commonality and predominance. Plaintiff Westmoreland's 6053 number was obtained via skip tracing, and if Defendants have a policy in place regarding skip tracing and the use of "manual dialing" as they claim, the manner in which that is implemented could serve as common proof relevant as to class certification. As Defendants admit that such a production would not be unduly burdensome (no account-by-account review is required), the Court finds it is proportional to the needs of the case and **GRANTS** Plaintiffs' request to compel the production of employee and dialer manuals.

Defendants note that several of its methods for obtaining consent have no manual/guide. (ECF No. 30 at 20:11-17.) This does not negate the need to produce employee/dialer manuals that would inform whether prior express consent was obtained on a classwide basis or on a subclass basis. However, Defendants must only produce such manuals that currently exist or were in existence during the proposed class period.

### III. CONCLUSION

For the foregoing reasons, the Court **HEREBY ORDERS** Defendants to provide supplemental responses to Plaintiffs' Interrogatories and Requests for Production, in accordance with the terms of this order, no later than **June 8, 2017.**

**IT IS SO ORDERED.**

Dated: May 9, 2017

Hon. Bernard G. Skomal
United States Magistrate Judge